BIRD & SON, INC. *vs.* HOWARD S. PALMER, *et al.,* TRUSTEES OF NEW YORK, NEW HAVEN & HARTFORD RAILROAD COMPANY.

JULY 23, 1943.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

Moss, J.   This is an action in assumpsit brought by a corporation which was the owner and shipper of certain goods, *viz.,* a carload of rugs for floor coverings, against the trustees of the New York, New Haven & Hartford Railroad Company, to which corporation the plaintiff had delivered these goods at East Walpole, Massachusetts, for carriage, by it and other carriers, to Louisville, Kentucky, to recover for loss of and damage to these goods in transit. For convenience we shall hereinafter treat the case as if it were against the aforesaid railroad corporation, which will be referred to as "the defendant."

The action was based on the so-called Carmack Amendment, as later amended, to the Interstate Commerce Act; and in its declaration the plaintiff alleged, in substance, that for these goods the defendant had issued to it a through bill of lading and thereby had made itself liable to the plaintiff, under that amendment, for loss of and damage to such goods,

while in the custody of an intervening carrier. This was the Merchants & Miners Transportation Company, a corporation which will hereinafter be referred to as the "marine carrier." The declaration also included a count in *indebitatus* assumpsit.

The defendant filed a plea of non assumpsit and also a special plea that the loss or damage to the plaintiff was caused, on September 21, 1938, by conditions beyond its control, to wit, by a tidal wave and hurricane, constituting an Act of God, and that this, by section 1 (b) of the contract in the bill of lading, exempted it from liability.

To this special plea the plaintiff filed a replication alleging that an Act of God was no defense because, at the time of the loss and damage, the shipment was under the custody and control of the marine carrier, on a dock or pier controlled by it, and that under the bill of lading and the tariff incorporated therein, the goods were insured, while on docks, piers and wharves, against risks of floods, cyclones, hurricanes, tornadoes and windstorms. These allegations were denied in a rejoinder filed by the defendant.

After the pleadings were closed, the case was tried before a justice of the superior court, without a jury; and at the conclusion of the trial he rendered a decision for the plaintiff for $1630.39 and interest thereon. The case is before us on exceptions by the defendant to this decision, on the grounds that it is contrary to the law and that the defendant is entitled to a judgment in its favor.

The only fact in dispute between the parties is whether, at the time when the tidal wave and hurricane admittedly occurred and caused the damages for which the plaintiff seeks recovery, the goods in question, damaged or lost, were in the possession of the defendant or were in the possession of the marine carrier, by which the goods, according to the terms of the bill of lading issued by the defendant to the plaintiff, were to be carried from the city of Providence in this state to Newport News, Virginia.

This question is of great importance in the case, since there was nothing in the bill of lading or in the common or statutory law to make the defendant liable to the plaintiff, in the circumstances here, for loss of, or damage to, any of the goods in question while in the possession or custody of the defendant. As to such loss or damage, the flood and hurricane, as an Act of God, would be a complete defense.

The trial justice, in his decision, found that all of the goods were at the time of the damage or loss in the custody or possession of the marine carrier; and after consideration of the pertinent evidence in the case on the subject, we are of the opinion that his finding was not clearly against the weight of the evidence. For this reason we sustain it.

That issue being settled, we must next consider the question whether, under the terms of the bill of lading and of the "tariff" incorporated therein by reference and of the provisions of the Carmack Amendment, the plaintiff has a right to maintain this action against the initial carrier to recover for the loss and damage caused to the goods while they were in the possession of the intermediate, marine carrier. This is purely a question of the law to be applied to settled facts.

The original bill of lading was introduced as an exhibit at the trial. It recites that the goods were received by the defendant at East Walpole, Massachusetts, "subject to the classification and tariffs in effect on the date of the issue of this Bill of Lading," and the route is given as in part via the marine carrier. The reverse side of this bill of lading is entitled "Contract Terms and Conditions."

The provisions of these terms and conditions which are or might be material in this case are as follows:

"Sec. 1 (a) The carrier or party in possession of any of the property herein described shall be liable as at common law for any loss thereof or damage thereto, except as hereinafter provided.

"(b) No carrier or party in possession of all or any of the property herein described shall be liable for any loss thereof or damage thereto or delay caused by the act of God, the public enemy, the authority of law, or the act

or default of the shipper or owner, or for natural shrinkage. . . .

"Sec. 9 (a) If all or any part of said property is carried by water over any part of said route, such water carriage shall be performed subject to all the terms and provisions of, and all the exemptions from liability contained in, the Act of the Congress of the United States, approved on February 13, 1893, and entitled 'An act relating to the navigation of vessels, etc.,' and of other statutes of the United States according carriers by water the protection of limited liability, and to the conditions contained in this bill of lading not inconsistent therewith or with this section. . . .

"(e) If the property is being carried under a tariff which provides that any carrier or carriers party thereto shall be liable for loss from perils of the sea, then as to such carrier or carriers the provisions of this section shall be modified in accordance with the tariff provisions, which shall be regarded as incorporated into the conditions of this bill of lading."

We are convinced that this last-quoted subsection, being subsequent to, and more particular in its language than the above-quoted subsection (b) of the first section, must prevail over it and comes within the last phrase of subsection (a) of the first section, *viz.,* "except as hereinafter provided." No contention is made by either of the parties in this case that the language in Sec. 9 (a) above quoted is material herein.

At the trial of this case it was proved by uncontradicted evidence that the tariff which was in effect at the time of the shipment herein involved, and which was therefore incorporated in the bill of lading by reference, contained the following rules:

"Rules Governing Tariff

Rule No. 210.—Liability of Carriers When Rates Include Marine Insurance or When Property is Insured, as Provided in Rule No. 215.

Property moving under rates named or provided for in this tariff, while in the custody of the water carriers,

from the time they receive it from shipper or from prior connecting carrier on docks, piers, wharves, bulkheads, platforms, lighters and/or craft, transfers and land conveyances at ports of loading of their vessels and while it is waterborne on vessels at and between ports and while it is on docks, piers, wharves, bulkheads, platforms, lighters and/or craft, transfers and land conveyances at port of discharge of vessels, until it is delivered to consignee (but not beyond the free time allowed for delivery as designated by tariff lawfully on file with the Interstate Commerce Commission and/or the United States Shipping Board, as the case may be, nor while held by the water carrier as warehouseman) or until it is delivered to connecting carriers thereat, Is Insured:

While on docks, piers, wharves, bulkheads, platforms, transfers and land conveyances, against the risks of fire, lightning, floods (meaning rising of navigable waters), cyclones, hurricanes, tornadoes, windstorms, derailment and/or accident to and/or overturning of the land conveyances, the collapse and/or subsidence of docks, piers, wharves, bulkheads, platforms and/or of any buildings thereon."

The material portion of Rule No. 215 is as follows:

"Rule No. 215.—Marine Insurance (See Rule No. 210.)

Rates named in this tariff include Marine Insurance while in possession of the following carriers: . . .

Merchants & Miners Transportation Co."

It is clear to us that these rules were included, by reference, in the bill of lading which was issued by the defendant to the plaintiff and which governs this case; and that the consideration which the plaintiff paid to the defendant, for the carriage of the goods covered by the bill of lading, included a charge for insurance of these goods, which have been proved to have been in the possession of the marine carrier, against the very risks and perils ·which caused the loss and damage to them for which the plaintiff is seeking in this case to recover from the defendant. The only question here is whether the plaintiff can recover such loss and damage in this action against the initial carrier, based on the Carmack Amendment as it stood at the time of the shipment.

The statutory provisions relied on by the plaintiff are contained in the following language of paragraph (11) of section 20 of the Interstate Commerce Act as amended by the "Carmack Amendment" and later amendments which were prior to the shipment involved in this case: "That any common carrier, railroad or transportation company subject to the provisions of this Act receiving property for transportation" in interstate or international commerce "shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, ... to which such property may be delivered . . . when transported on a through bill of lading, and no contract, receipt, rule, regulation, or other limitation of any character whatsoever shall exempt such common carrier . . . from the liability hereby imposed; . . . *Provided,* That if the loss, damage, or injury occurs while the property is in the custody of a carrier by water the liability of such carrier shall be determined by and under the laws and regulations applicable to transportation by water, and the liability of the initial or delivering carrier shall be the same as that of such carrier by water . . . ." See 46 U. S. Statutes at Large, part 1, p. 251.

The act provides, in paragraph (12) of section 20, for recovery by the initial carrier from the connecting carrier, on the line of which the loss or damage occurred, of the amount of any judgment obtained by the shipper against the initial carrier, under the above provisions.

The defendant makes no contention that there was any law or regulation which, under the first part of the proviso last above quoted from paragraph (11), affected the liability of the marine carrier involved in this case. On the contrary the defense in this case, if it be considered as proven that the loss and damage occurred while the goods were in the possession of the marine carrier, is that the statutory provisions above stated do not apply to the defendant, unless the liability of such marine carrier is based only on a breach of its

"common law duty"; which duty the defendant interprets as not including any contractual duty as to insurance.

The plaintiff, on the other hand, contends that these provisions also apply and support an action against an initial carrier, when the breach is by a *marine* carrier the liability of which is governed by the language above quoted from the Interstate Commerce Act, beginning with the word *"Provided"*, and which by a through bill of lading binding on it, has assumed liability as an insurer. The plaintiff further contends that the marine carrier involved in this case assumed such liability by the terms of the joint tariff which was, by reference, incorporated in the joint bill of lading.

Specifically the plaintiff contends, in substance, that the last part of the above-quoted language of the Interstate Commerce Act as amended, *viz.*, that "the liability of the initial . . . carrier" shall be the same as that of such carrier by water "means exactly what it states"; and that the defendant, by delivering to the plaintiff the bill of lading, with the tariff incorporated therein by reference, had for itself and for and in behalf of, and with the consent of the marine carrier, made an agreement with the plaintiff that the goods were insured, while they were in the possession of the marine carrier and were on docks, piers, wharves, etc., against floods, cyclones, hurricanes, tornadoes and windstorms.

The defendant cites and discusses four cases only, all as showing the proper meaning to be given to the words "caused by it" as used in paragraph (11) above quoted from the Carmack Amendment. These are *Atlantic Coast Line R. R. Co.* v. *Riverside Mills,* 219 U. S. 186; *Adams Express Co.* v. *Croninger,* 226 U. S. 491; *New York, Philadelphia etc., R. R. Co.* v. *Peninsula Produce Exchange,* 240 U. S. 34, and *Cincinnati etc., Ry. Co.* v. *Rankin,* 241 U. S. 319. The plaintiff also discusses them in its brief and cites and relies upon two other cases on this point. It is not held in any of the cases cited by either party that the words "caused by it" apply only in a case where the loss of or damage to the plain-

tiff's goods was caused by an *affirmative* breach of duty on the part of the carrier in possession of the goods.

That these words do not have such a restricted meaning is shown by the following language used by Mr. Justice Hughes in the opinion of the court in *New York, Philadelphia etc., R. R. Co.* v. *Peninsula Produce Exchange, supra,* involving failure to transport goods with reasonable dispatch: "The words 'any loss, damage, or injury to such property' caused by the initial carrier or by any connecting carrier are comprehensive enough to embrace all damages resulting from any failure to discharge a carrier's duty with respect to any part of the transportation to the agreed destination." See also *Lehigh Valley R. R. Co.* v. *John Lysaght, Ltd.,* 271 Fed. 906, (C. C. A. 2d 1921), *certiorari* denied, without opinion, in 256 U. S. 704.

It seems clear to us that in each of the cases above mentioned the expression "common law duty of a carrier" or similar expression was not meant to exclude any *contractual* duty assumed by an intermediate carrier with respect to any part of the transportation under such joint bill of lading and the rules referred to therein. In other words, the finding was that the effect of the Carmack Amendment was not to impose on the intermediate carrier any additional duty or obligation to the shipper, but only to make the initial carrier responsible to the shipper for any breach of the duties which the intermediate carrier owed to the shipper, including such duties as it owed to the shipper under the terms of the joint bill of lading which the Carmack Amendment required.

We therefore conclude that the plaintiff, on the facts proved in the instant case, would be entitled to maintain an action against the marine carrier as an insurer; and that under the above-quoted provisions of the Interstate Commerce Act, as amended up to the time when the loss and damage involved in this case occurred, the plaintiff is entitled to recover from the defendant the loss and damage

to its goods which occurred while they were in the possession of the marine carrier.

The defendant's exceptions are overruled, and the case is remitted to the superior court for the entry of judgment on the decision.

*Edward Winsor, Edwards & Angell,* for plaintiff.

*William E. Boyle,* for defendant.

ROLLIN BUCKMINSTER *et al. vs.* ZONING BOARD OF REVIEW OF THE CITY OF PAWTUCKET.

ELIZABETH L. CUSHMAN *et al. vs.* SAME.

JULY 23, 1943.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

CAPOTOSTO, J. These are two petitions for writs of *certiorari* to review a decision of the Pawtucket zoning board

of review granting the application of Charles B. Lennon to locate and operate a "funeral home" at 209 Central avenue in that city. The writs were issued and the papers of the board in the matter were duly certified to this court. Since both petitions raise identical questions, we will hereinafter treat them as if only one petition were before us for consideration.

The case was argued in this court on December 2, 1942 and, on January 28, 1943, we remanded the papers to the board for the purpose of clarifying and completing its decision in accordance with our opinion of that date. *Buckminster* v. *Zoning Board of Review of the City of Pawtucket*, 68 R. I. 515. In compliance with such direction the board amended its decision and, on March 11, 1943, the papers were returned to this court. On April 30, 1943, the parties were allowed to present such further argument in support of their respective contentions as they deemed necessary under the amended decision.

Unless otherwise indicated, all boundaries, distances, directions and locations hereinafter mentioned have been determined by us from a plat in evidence before the board. We therefore speak in approximate terms as to such matters.

The property in question is located at the southwest corner of Central avenue and Orchard street. It has a frontage of 125 feet on the southerly side of the former street and of 60 feet on the westerly side of the latter. Central avenue is a main highway running easterly from Pawtucket to Seekonk, Massachusetts. Orchard street is a side street, about 425 feet long, which enters, but does not cross, Central avenue from the south. The house on the premises just mentioned has ten rooms. Attached to the house and connecting therewith is a three-car garage, which is entered from Central avenue. Lennon and his wife alone live in this house, they having no children. He applied for an exception to the zoning ordinance so that he might carry on his business of an undertaker from his residence. The petitioners here own property or reside in that neighborhood.

Lennon's property is in a district classified under the zoning ordinance as a residence B district. Therein, besides the uses permitted in a dwelling house district, the following are the permitted uses: Apartment house, boarding house or hotel, with certain restrictions; a gasoline filling station, stable, or an aeroplane landing field, airship hangar and accessory buildings and structures, if approved by the board of review.

The plat in evidence shows the westerly boundary line of an area zoned for business to the east of the southwest corner of Central avenue and Orchard street, where Lennon's property is located. The distance from this corner to that boundary line, as one proceeds easterly along the southerly side of Central avenue, is 350 feet. In between these two points are three dwellings, an apartment house, a church and a store. Next to the store is a gasoline filling station, which is in the area zoned for business. The distance from a point on the northerly side of Central avenue opposite the above-described corner to the above-mentioned boundary line on that side of the highway is 410 feet. Nine dwellings for one or more families are located between these two points. Immediately to the east of said boundary line there is a vacant lot 50 feet wide, and adjoining thereto there is a "Contractor's Yard", with garage, carpenter shop and office building. The remainder of the neighborhood in the immediate vicinity of Lennon's property consists of dwelling houses of the character hereinbefore described.

Acting under the authority of our zoning statute, now general laws 1938, chapter 342, the city of Pawtucket adopted in 1928 the zoning ordinance involved in this case. Section 16 of the ordinance establishes a board of review, with power, after notice and hearing, to determine and vary, in a specific case and subject to appropriate conditions and safeguards, the application of the regulations established by the ordinance, in harmony with the general purpose thereof, which, as stated in section 1 thereof, is to promote the public health, safety, morals and general welfare. Para-

graph 8 under section 16 gives the board power to "Approve in any district an application for any use or building deemed by the said Board to be in harmony with the character of the neighborhood and appropriate to the uses or buildings permitted in such district."

Lennon and one Edward F. Butler, who was in the real estate business, testified at the hearing before the board in support of the former's application for an exception under the ordinance, while five persons, one of whom was the petitioner Buckminster, testified against the granting of such application. Petitions signed by persons living in the general neighborhood of Lennon's premises were presented to the board in favor of and in opposition to the application. Both parties were represented by counsel.

Lennon testified that his house was too large to be used merely as a residence for himself and wife, and that he would continue to reside there if he were permitted to conduct his business as an undertaker from that place. He then described his property and the manner in which he would conduct his business, pointing out that the main entrance to the house was on Central avenue and that there were other funeral homes a comparatively short distance further west on that highway. Butler testified that he sold the house to Lennon; that he had lived in that neighborhood since 1930; that Central avenue, Orchard street and other nearby streets had "seen the best days as far as residences are concerned"; and that, in his opinion, a funeral home on Lennon's premises would not affect the market value of property in that neighborhood.

The testimony of the five persons who opposed the application was, in substance, that a funeral home near where they lived would disturb their peace of mind, thereby tending to injure their health; that it would increase the danger from traffic, especially as to children who lived on Orchard street; and that it would depreciate the value of property in the neighborhood.

In its amended decision the board, after stating that it examined Lennon's premises and viewed the neighborhood, finds that the effect of a funeral home at that place on the occupants of neighboring property would be diminished if Lennon confined the entrance to and the signs of the funeral home to Central avenue; that such a home would not seriously affect the general health, morals or public welfare of the neighborhood; and that it would not depreciate the value of other property therein to any greater extent than a gasoline filling station or a stable, which are permitted uses under the ordinance in that zone. Upon these findings the board granted the application with the restrictions as to entrance and signs above mentioned.

The petitioners do not question in any way the validity of the ordinance or the board's right to pass on the application as an exception under the provisions of section 16, paragraph 8 thereof. They contend that the decision of the board is erroneous in that it is based on considerations personal to Lennon and in disregard of the general welfare. We do not agree with this contention, for we cannot assume, as the petitioners apparently do, that the board gave little, if any, consideration to the public interests in granting the exception. The petitioners completely disregard the fact that the board, after taking evidence and hearing argument of able counsel, examined Lennon's premises and viewed the surrounding neighborhood, the easterly boundary of which unquestionably adjoins an area zoned for business. The reasons given by the board for its decision, when read as a whole and in connection with the evidence, fairly show that, in its opinion, the granting of the exception was not unduly in conflict with the public interest as expressed in the ordinance.

The petitioners further contend that the board erred in granting Lennon's application as there is no competent evidence in the record which shows that the exception was necessary to promote the public health, safety, morals or general welfare. In other words, they argue that, according

to the statute and the ordinance enacted thereunder, the board was without power to grant Lennon's application unless the evidence affirmatively established that the exception was in furtherance of the public interests. This is too restricted a view of the board's power under the statute and the ordinance.

General laws 1938, chap. 342 permits any city or town in this state to enact a zoning ordinance; but, according to section 6 thereof, neither the statute nor any ordinance enacted thereunder shall create or be considered to create any vested rights in any person, or to be or create any incumbrance upon the title of any person affected by any such ordinance. The main purpose of the zoning statute apparently is to authorize a municipality to enact, in the public interest and within the scope of the statute, a zoning ordinance restricting the use of real property as the particular needs of any given municipality may reasonably require. If the restrictions imposed by the ordinance are reasonable, an owner of land who is affected thereby in common with all others cannot complain. But, in the application of such a law, there may arise in individual cases need for an exception therefrom. The legislature therefore required, in section 8 of the statute, that every zoning ordinance shall provide for a board of review which may make special exceptions to the terms of the ordinance in harmony with its general purpose and intent.

This mandatory requirement of the statute is in the nature of a safety valve which the legislature wisely provided in order that, in a proper case, the public interests and those of an owner of land might be fairly adjusted without undue disturbance to the general welfare. It is therefore our opinion that in the instant case the board had the power to grant Lennon's application if, on competent evidence, it found that the exception sought by him was not unduly contrary to the ordinance provisions for the preservation of the common interests.

In addition to the claims that a funeral home on Lennon's premises would depreciate the value of neighboring property and would increase the danger from vehicular traffic, the real ground of petitioners' main objection appears to be that the location and operation of a funeral home on those premises would bring into the community an element which would affect adversely the health and happiness of nearby residents. The factual issues thus raised were the subject of conflicting evidence. What effect such a home, when properly conducted under reasonable restrictions in the general interests, might have upon the health of a person of ordinary sensibility, and the question of whether it reasonably can be located and operated in a particular neighborhood without unduly conflicting with the public welfare as expressed in a zoning ordinance, are considerations which may be the subject of different and opposite opinions. These are questions of fact, however, that were intended by the statute and ordinance to be determined, at least in the first instance, by those who constituted the board of review.

In a case like the one under consideration, it is the well-settled law of this state that the decision of a zoning board of review will not be set aside unless it clearly appears that the board acted arbitrarily or abused its discretion. *Potter* v. *Zoning Board of Review of Cranston,* 65 R. I. 286. Upon the conflicting evidence in the record before us, and considering the conditions which the board attached as to the manner in which Lennon might use his residence as a funeral home, we are of the opinion that it does not clearly appear that the respondent board acted arbitrarily or abused its discretion in granting the application.

The decision of the respondent board is affirmed in each case.

*Hurley, Moriarty & Connly, George Hurley, Walter V. Moriarty, John W. Moakler, Jr.,* for petitioners.

*Clarence N. Woolley, Walter J. Hennessey,* for respondent board.